## SWIFT & CO. et al. v. FORTUNE.

(Circuit Court of Appeals, Eighth Circuit. February 24, 1923.)

No. 5888.

1. Bankruptcy ⟳414(3)—False statements held to bar discharge.

Evidence *held* to show that bankrupt, a retail merchant, knowingly and willfully made materially false statements in writing for the purpose of obtaining credit, and on which he obtained property on credit, which barred his right to a discharge.

2. Bankruptcy ⟳413(7)—One objection, if sustained by the evidence, requires refusal of discharge.

If one of the objections raised in opposition to the discharge of a bankrupt is well pleaded, and is sustained by the evidence, discharge should be refused.

Appeal from the District Court of the United States for the District of Colorado; Robert E. Louis, Judge.

In the matter of T. R. Fortune, bankrupt. Swift & Co. and others appeal from an order granting bankrupt's discharge. Reversed.

A. B. Manning, of Denver, Colo., for appellants.

John Horne Chiles, of Denver, Colo., for appellee.

Before SANBORN and KENYON, Circuit Judges, and POLLOCK, District Judge.

KENYON, Circuit Judge. This is an appeal from an order of the District Court of the United States for the District of Colorado granting a discharge in bankruptcy to one T. R. Fortune, who will herein be designated as the bankrupt.

During the years 1918, 1919, and a part of 1920, the bankrupt had been in the grocery and restaurant business in Greeley, Ft. Collins, and Wellington, Colo. In purchasing and financing these various business enterprises the bankrupt borrowed approximately $4,000 from the First National Bank of Greeley, $3,900 from the First National Bank of Ft. Collins, and $3,000 from the First National Bank of Wellington. Chattel mortgages were given by him upon the furniture and fixtures in the grocery and meat stores and the café at Greeley, representing the purchase price, less the amount borrowed from the banks and applied thereon. The merchandise business at Wellington was purchased for $9,000, part of which was paid by the bankrupt's equity in a house at Greeley, and part by the $3,000 borrowed from the First National Bank of Wellington.

In the winter of 1920 he sold the fixtures of the Greeley store and transferred the merchandise to the Ft. Collins store. March 29, 1920, the bankrupt made an assignment of all of his property to one H. H. Lowe for the benefit of his creditors. April 14, 1920, an involuntary petition in bankruptcy was filed against him, and he was adjudged a bankrupt on May 7, 1920.

At the first meeting of creditors it was shown that the assets of the bankrupt would amount to approximately $10,000 less than his liabili-

ties. It also appeared that the bankrupt had turned over to the trustee some canceled checks, some book accounts, and a partial list of his creditors; that he had failed to turn over any cash book or books of account, the bankrupt explaining that what he had in the way of books of account he had left at Ft. Collins, to use his language, "with a barrel of other trash, and I suppose they are burned up by this time."

July 1, 1920, the bankrupt filed petition for discharge. September 13, 1920, appellants filed objections to said discharge, alleging that the bankrupt had attempted to conceal his true financial condition by failing to keep books of account or records; second, had concealed books of account, from which his financial condition could be ascertained; third, had obtained property on credit on materially false written statements, made for the purpose of obtaining such credit, to the J. S. Brown Mercantile Company and to Swift & Co., appellants herein. Two of these statements, one to the J. S. Brown Mercantile Company and one to Swift & Co., are dated October 29, 1919. A subsequent statement to the J. S. Brown Mercantile Company was made on January 13, 1920.

The court referred the objections to William B. Harrison as special master, who took testimony thereon and recommended that the objections be overruled and the discharge granted. April 26, 1921, the District Court entered its order overruling the objections to the discharge of bankrupt and granted the same. Appellants bring the matter to this court.

[1.] There are many assignments of error, but they all relate to the three general subjects and objections heretofore set forth. It is conclusively established from the record that the bankrupt obtained property on credit upon a materially false statement in writing made by him to different parties for the purpose of obtaining such credit. Hence we discuss this matter first.

Three separate statements were made by him in writing, two to the J. S. Brown Mercantile Company, of date October 29, 1919, and January 13, 1920; the other to Swift & Co., of October 29, 1919. In statement to the J. S. Brown Mercantile Company of January 13, 1920, the bankrupt shows assets in his business of $52,333 and liabilities of $15,600. In the record of real estate owned as set forth in said statement he claims to be owner of 440 acres of land in Weld county, Colo., of a value of $13,200, with an incumbrance of $4,800, and two houses in the city of Greeley, Colo., of a value of $6,400, with an incumbrance of $3,400, or a net worth of $48,133. He makes the same claim of land and house ownership in the Brown statement of October 29, 1919 except a slight difference in the amounts of the incumbrances.

The trustee's report three months later shows that his liabilities exceeded his assets by $10,836.29, or a difference between January 13, 1920, and April, 1920, of $58,969.29. The bankrupt attempted to explain this large shrinkage, but such explanation is entirely unsatisfactory. It appears from the record that during this period of time the bankrupt made sales approximately $6,370. His testimony is that he made practically no purchases of merchandise during that period, except for cash, and, further, that the amount realized from sales was applied on bills.

In the statement to the Brown Mercantile Company of January 13, 1920, his indebtedness is given as $15,600. If he had in truth received the $6,370 cash, as he testified, and applied the same on bills payable, his indebtedness should have been decreased to approximately $9,000. However, according to the assignee's report, in the assignment made to Lowe, there was a merchandise indebtedness on March 29th or thereabouts of approximately $30,000. There is discrepancy between the January, 1920, J. S. Brown Mercantile Company statement, and the statement of the assignee in the assignment of March 29, 1920, of some $15,000. If the amounts realized from sales had been applied on debts, as testified to by the bankrupt, the discrepancy would amount to about $20,000.

What is the explanation of this? The bankrupt in his testimony claims that he forgot to insert in his written statement of January 13, 1920, certain items of indebtedness, namely, $3,000 to the Wellington Bank, $4,000 to the First National Bank of Greeley, $7,500 amount owing on Hudson car and house at Greeley, $4,200 to the First National Bank, Ft. Collins, also $2,000 to a man by the name of Small, making a total of $20,700. The amazing situation is presented that the bankrupt forgot to insert in this property statement more of his indebtedness than he therein included. Lapses of memory such as are here evidenced, when a party is attempting to secure credit and property from others, naturally arouse doubt as to honesty and square dealing. In his statement of October 29, 1919, to the Brown Mercantile Company he places his liabilities at $6,000 and his assets, not including real estate, at $32,700. There is here also a marked degree of forgetfulness.

In the property statement of January 13, 1920, he claims that title was in his name to two houses in the city of Greeley, of the value of $6,400, with an incumbrance of $3,400. Practically the same claim is made in the statement to the J. S. Brown Mercantile Company of October 29, 1919. The master finds that the evidence shows the bankrupt had held title to the two houses under contracts of sale. He also finds:

"One of the houses he disposed of in part payment for the Wellington store, and the other house or the equity therein is a part of his estate in bankruptcy."

So we find him listing as assets one house which he did not own, having traded it in as part payment on the Wellington store, that likewise being listed as part of his assets. The omission from the statements hereinbefore referred to, made to the J. S. Brown Mercantile Company, of indebtedness aggregating $20,000 and the further insertion as assets of a house he did not own, would seem sufficient to show a designedly false statement. This is not all, however. In his statements of October 29, 1919, and January 13, 1920, to the Brown Mercantile Company, it is set forth that the title is in his name to 440 acres of land in Weld county, Colo., in which he had an equity of $8,400. At the first meeting of creditors, June 24, 1920, where certain evidence was taken, portions of which are in the record, the bankrupt denied that he ever had any interest in, or owned or held title to, land in Weld county. Finding is made by the special master that this land was sold to G. B. Fortune, the bankrupt's brother, by one J. H. Sanders; that in the deed

from Sanders the name of the grantee was left blank; that his brother, G. B. Fortune, sold the land to bankrupt, and delivered the deed without filling in the blank; that therefore he had no legal title to the land at the time the statements were made; but the master finds that the bankrupt believed the deed vested title in him, and that his statement was made in good faith. The bankrupt attempted to explain in his testimony at the meeting of creditors in June, 1920, when asked concerning this land, and the wrong information he had imparted in his written statements, by saying that he knew he "had land to sell." He, however, at the same hearing, expressly denied, under oath, any ownership of it. That was at a time when an attempt was being made to discover any unreported assets. As throwing light on this situation, we think it advisable to set out a part of the findings of the master as to this transaction as follows:

"The bankrupt disclosed the transaction with his brother in regard to the land in his schedules, and in his testimony at the first meeting stated that he had lost the deed. At the hearing on the objections to his discharge, he stated that he had found the deed in his trunk. It was discovered from the testimony of other witnesses that, after finding the deed, the bankrupt had placed the deed in the hands of a real estate agent at Greeley and authorized said agent to sell the land. It is contended that this was a corrupt attempt to dispose of property belonging to his estate in bankruptcy, and that for that reason the bankrupt is not entitled to his discharge. Undoubtedly the bankrupt's motive was corrupt and his conduct reprehensible."

The bankrupt is faced with this dilemma. If the master's finding is correct, that the bankrupt believed the deed vested title in him, what is to be said of his testimony that he did not own the land, and never owned the same. If he believed, in fact, he was the owner of the land, was he attempting to conceal assets? It is more reasonable to suppose that he made a false statement to Swift & Co. and to the J. S. Brown Mercantile Company, in stating that the title was in his name, than to believe that he deliberately swore falsely. The bankrupt in his testimony admits that these statements were made for the purpose of securing credit, and that he did secure credit thereon. We cannot conceive how, in the light of this record, any other conclusion can be reached than that the statements made to the J. S. Brown Mercantile Company, and also, in a lesser degree, to Swift & Co., were materially, knowingly, and willfully false, and made with intent to deceive and for the purpose of obtaining from them property on credit. The false statement under the act must be one intentional and knowingly untrue. Gilpin v. Merchants' Nat. Bank, 165 Fed. 607, 91 C. C. A. 445, 20 L. R. A. (N. S.) 1023; Franklin v. Monning Dry Goods Co., 217 Fed. 929, 133 C. C. A. 601; In re Stafford (D. C.) 226 Fed. 127; In re Kerner, 250 Fed. 993, 163 C. C. A. 243. We have no hesitancy from this record in finding the false statements in this case within the rule anounced in these authorities. In view of this conclusion, we deem it unnecessary to discuss the questions raised as to the keeping or failing to keep, or the destruction of books by the bankrupt. In this connection, however, it is peculiar that a business man, doing a business amounting to approximately $150,000 a year, should care no more for what books he kept, insufficient even as they were, than to designate them as "trash," and leave them in an ash barrel, expecting them to be burned up.

[2] If one of the objections raised in opposition to discharge of the bankrupt is well pleaded, and is sustained by the evidence, then the bankrupt should be refused a discharge. Hudson v. Mercantile National Bank of Pueblo, Colorado (this circuit) 119 Fed. 346, 56 C. C. A. 250; Collier on Bankruptcy (Ed. 1917) 367. The discharge of bankrupts from the burden of debt is a privilege which the law grants under certain circumstances. The theory is to enable the unfortunate honest debtor to be released from the oppressive burden of debt, to start anew with a clean slate and re-establish himself in business, thus not only helping him, but bringing about a resultant benefit to society. Its purpose is not to relieve the debtor from fraudulent conduct, nor to put a premium on dishonest business methods. The law should not reward by a discharge such conduct of a bankrupt as is presented in this record. The findings of the special master and referee are not in accord with the evidence, and are manifestly erroneous. The objection of appellants to the discharge of the bankrupt upon the ground we have herein discussed should have been sustained.

The order granting such discharge is reversed.